NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

## IN RE UNITED STATES,
*Petitioner.*

_____

Miscellaneous Docket No. 163

_____

On Petition for  Writ of Mandamus to the United States Court of Federal Claims in No. 11-CV-0779, Judge Thomas C. Wheeler.

_____

## ON PETITION

_____

Before DYK, MOORE, and TARANTO, *Circuit Judges.*

DYK, *Circuit Judge.*

## O R D E R

An investor seeking to represent the class that owned common shares in the American International Group, Inc. ("AIG") during the financial crisis of 2008 has sued the United States in the United States Court of Federal Claims ("Claims Court").  It asserts that the actions of the Federal Reserve Board, Federal Reserve Bank of New York, and Department of Treasury relating to its providing AIG credit under Section 13(3) of the Federal Reserve Act, Pub. L. No. 63-43, § 13(3) (1913) (codified as amended

at 12 U.S.C. § 343), gave rise to a claim for damages under that statute or the Fifth Amendment of the United States Constitution.  In pursuit of its claims, the investor seeks to depose Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve.  Before this court is the government's petition for a writ of mandamus seeking to direct the Claims Court to issue a protective order.  For the following reasons, we grant the petition.

## Background

Respondent Starr International Co., Inc. ("Starr") is the lead plaintiff in a class action filed in the Claims Court.  The suit was brought on behalf of investors that had owned AIG common stock between September 16, 2008, and September 22, 2008, or had the right to vote at AIG shareholders meeting on June 30, 2009.

At the center of Starr's complaint is the September 2008 line of credit secured by AIG from the government pursuant to section 13(3) of the Federal Reserve Act.  That provision authorizes a Federal Reserve Bank to provide credit in "unusual and exigent circumstances," which must be approved by no less than five members of the Board of Governors of the Federal Reserve System.  Section 13(3) further requires that any notes, drafts, and bills of exchange be secured to the satisfaction of the Federal Reserve Bank.

After the Federal Reserve Board voted in favor of authorizing AIG section 13(3) credit, AIG was offered a term sheet that would allow access to $85 billion secured by all of AIG's assets with an initial annual cost to AIG of approximately 14.5% per annum on the condition that the government was given control of AIG as controlling lender and controlling shareholder.  The term sheet further required that AIG provide to the government a nearly 80% equity share in AIG.

According to Starr's complaint, the government co-erced AIG's Board of Directors into accepting its terms, which Starr characterizes as grossly disproportionate given that the loan was fully secured and a 14.5% interest rate was also imposed. Starr premises the Claims Court's jurisdiction on 28 U.S.C. § 1491(a), alleging that the government took AIG's property, including 562,868,096 shares of AIG common stock, without due process or just compensation as required by the Takings Clause of the Fifth Amendment of the U.S. Constitution. Starr's complaint further asserts that by demanding a 79.9% interest in AIG as part of the terms of line of credit, the government exceeded its authority under Section 13(3), thus illegally exacting the property of AIG's shareholders.

In March 2012, the government moved the Claims Court to dismiss Starr's complaint for lack of jurisdiction and for failure to state a claim upon which relief could be granted. Among other things, the government argued that Starr's illegal exaction theory should be dismissed because Section 13(3) fails to mandate the return of money to it or AIG. In its discussion of that portion of the government's motion, the Claims Court explained that "this case involves novel applications of Section 13(3)," and "it is premature at this stage to rule decisively on the issue . . . ." *Starr Intern. Co. v. United States*, 106 Fed. Cl. 50, 84 (2012).

Soon after defeating the government's motion to dismiss, Starr sought to depose Chairman Bernanke concerning the above-mentioned events and the Federal Reserve's decision-making process. In response, the government moved the Claims Court for a protective order. The government's motion urged that Bernanke was currently the chairman of the Federal Reserve with a broad range of responsibilities, that his deposition would be disruptive and that Starr had not exhausted all other methods of discovery before deposing the Chairman,

noting that Starr had scheduled depositions of former Vice-Chairman Donald Kohn and other key decision makers from the Department of the Treasury and Federal Reserve Bank of New York. The government further argued that it would be improper for Starr to depose Chairman Bernanke concerning the Board's internal deliberations regarding its decisions or Chairman Bernanke's thought processes on related issues.

In response, Starr argued that there were several reasons why Mr. Bernanke's deposition was important to the case. Starr argued that Bernanke was a key decision maker in the government's evaluation and initiation of the AIG taking. Starr further argued that Chairman Bernanke had knowledge of various relevant aspects of the case. In addition, Starr pointed out that Chairman Bernanke had provided testimony before Congress, given various public speeches and written a book about the AIG events.

On July 29, 2013, the Claims Court issued an order denying the government's motion. The Claims Court found that Mr. Bernanke was a key witness in this case, and his testimony would be highly relevant to the issues presented. The court acknowledged that generally high-ranking officials cannot be forced to testify absent extraordinary circumstances. However, because of Mr. Bernanke's personal involvement in the decision-making process to bail out AIG, the court concluded that it is "improbable that Plaintiff would be able to obtain the same testimony or evidence from other persons or sources." Because granting the protective order would in effect "deprive the Court of important relevant evidence in its fact-finding and resolution of this case," the Claims Court held that Starr should be permitted to depose Mr. Bernanke, although the Claims Court trial judge would himself attend the deposition "to assure that proper and

efficient use of time is maintained." *Starr Intern. Co., Inc. v. United States*, 112 Fed. Cl. 56, 59 (2013).

The government petitioned this court for a writ of mandamus to vacate the July 29, 2013, order and direct the Claims Court to enter a protective order. We have jurisdiction under 28 U.S.C. § 1651. *See In re United States*, 463 F.3d 1328 (Fed. Cir. 2006).

DISCUSSION

I

Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), this court has authority to issue a writ of mandamus "as 'necessary or appropriate in aid of' our jurisdiction." *Miss. Chem. Corp. v. Swift Agric. Chems. Corp.*, 717 F.2d 1374, 1379 (Fed. Cir. 1983) (citing 28 U.S.C. § 1651(a)). The remedy of mandamus is available only in extraordinary situations to correct a clear abuse of discretion or usurpation of judicial power." *In re Calmar, Inc.*, 854 F.2d 461, 464 (Fed. Cir. 1988). A party seeking a writ bears the burden of proving "'that its right to issuance of the writ is clear and indisputable, . . . and that it lacks adequate alternative means to obtain the relief sought.'" *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 804 (Fed. Cir. 2000) (quoting *In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1387 (Fed. Cir. 1996)).

We agree with the government that this discovery order warrants mandamus. A number of our sister circuits have recognized that mandamus may properly be used as a means of immediate appellate review of a denial of a protective order to prevent deposition of high-ranking government officials. *See In re United States (Jackson)*, 624 F.3d 1368, 1372-73 (11th Cir. 2010); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008); *In re Sec. Exch. Comm'n*, 374 F.3d 184, 187-88 (2d Cir. 2004); *In re United*

*States (Holder)*, 197 F.3d 310, 316 (8th Cir. 1999); *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995); *In re United States (Kessler)*, 985 F.2d 510, 513 (11th Cir. 1993). As they have explained, if the law were otherwise, serious repercussions for the relationship between different branches of government could result if an official was required to place him or herself in contempt to seek immediate review. *Jackson*, 624 F.3d at 1372. The right to not appear during deposition would be lost if review was denied until final judgment.

## II

Rule 26(b)(1) of the Rules of the Claims Court authorizes "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." FCL CT Rule 26(b)(1). The Claims Court concluded that the deposition of Chairman Bernanke was highly relevant given his personal involvement in the events, and thus his testimony should be discoverable. Although exceptions to the general rule that the public has a right to evidence must be narrowly construed, *United States v. Bryan*, 339 U.S. 323, 331 (1950), mandamus should issue to prevent such a deposition because Chairman Bernanke is a highly ranked government official and Starr has not shown extraordinary circumstances. *Jackson*, 624 F.3d at 1377; *Holder*, 197 F.3d at 316; *Kessler*, 985 F.2d at 513.

## A

We begin with the Supreme Court's decision in *United States v. Morgan*, 313 U.S. 409, 422 (1941), which has long stood for the general proposition that high officials should rarely be compelled to testify regarding the deliberative process used to arrive at a decision within the scope of their government duties. In *Morgan*, the trial court had allowed the Secretary of Agriculture to be examined as to how he had arrived at his decision to set

rates to be charged by market agencies for their services. *Id*. As an aside to the merits of the case, the Supreme Court admonished the trial court for allowing the Secretary to be questioned at length regarding the manner and extent of his study of the record and his consultation with his subordinates. *Id*.

In cases following *Morgan*, two primary rationales for limiting the examination of current high-ranking government officials have emerged. First, that allowing such examination can disturb the integrity of the administrative process. *Id*. For example, in *Montgomery Ward & Co. v. Zenith Radio Corp*., 673 F.2d 1254, 1264 (CCPA 1982), our predecessor, the Court of Customs and Patent Appeals, ruled that it would be improper to allow the plaintiff challenging a settlement agreement to probe into the Department of Commerce's motives and processes behind the settlement. Likewise, in *Bacon v. Department of Housing and Urban Development*, we ruled that a plaintiff could not call the Secretary of Housing and Urban Development to testify regarding his reduction-in-force decision, citing the Supreme Court's strong warning "against inquiry into the mental processes of an agency head." 757 F.2d 265, 270 (Fed. Cir. 1985). Second, that high-ranking officials must be permitted to perform their official tasks without disruption or diversion. *NEC Corp. v. United States*, 151 F.3d 1361, 1375 (Fed Cir. 1998) (citing *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985)). The rationale of this exclusion from testimony is that such officials "have greater duties and time constraints than other witnesses" and "without appropriate limitations, such officials will spend an inordinate amount of time tending to pending litigation." *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007).

Our sister circuits have provided substantial guidance as to what is required to justify deposing current high-

ranking government officials.  As an initial matter, courts have held that even in cases such as this, in which the government is a movant, the party seeking deposition bears the burden of proving extraordinary circumstances.  *See, e.g., Holder*, 197 F.3d at 316.  In deciding whether that burden has been met, courts have held that the government official must have personal involvement or first-hand knowledge of the underlying dispute.  *See, e.g., Bogan*, 489 F.3d at 423.  In addition, courts have set forth requirements that are helpful in analyzing whether the deposition is truly necessary, including whether the official has "first-hand knowledge related to the claim being litigated," and "discovery is permitted only where it is shown that other persons cannot provide the necessary information."  *Id*. at 423. (citing *Holder*, 197 F.2d at 314).  These considerations are designed to ensure that current high-ranking officials are only deposed in cases of "extraordinary circumstances" or "special need."  *Jackson*, 624 F.3d at 1372.

B

The Claims Court held that Starr had demonstrated the extraordinary circumstances necessary to warrant deposing Chairman Bernanke at this time.  We disagree.  On the record before us, we find that there are at least two reasons why Chairman Bernanke should not be deposed as Starr proposes, and why a protective order should issue.

First, Chairman Bernanke is currently serving as the Chairman of the Federal Reserve Board and his term does not expire until February 1, 2014.   As the government points out, the Chairman carries the same rank as a Cabinet-level Secretary and is the active executive officer of the Board and chair of the Federal Open Market Committee.   Scheduling Chairman Bernanke's deposition while he occupies his current position creates all the risks

of disrupting significant ongoing government activities identified in the courts of appeals decisions following *Morgan*. Moreover, a current deposition creates the risks of probing into the decision-making process discussed below. There appears to be no substantial prejudice to Starr in postponing the deposition of Chairman Bernanke, if one occurs, until after he leaves his post. The deadline for discovery should, if necessary, be extended beyond the current close on December 20, 2013, for that purpose.

Second, Starr proposes to inquire into the Federal Reserve's deliberative processes or Chairman Bernanke's mental processes. *Morgan* and its successors set a very high standard before any such inquiry of a high government official is allowed, requiring a showing of extraordinary circumstances. Starr has not made the necessary showing.

Starr asserts a takings claim based on the theory that AIG was coerced into accepting the terms of the bailout and a statutory violation based on the theory that the government did not have the authority to take an equity stake in AIG.

To support this theory, as best as we can make out, Starr seeks to question Chairman Bernanke on the following issues, which pertain to the Federal Reserve's deliberative processes and the Chairman's mental state: (1) whether Chairman Bernanke and the Federal Reserve believed that the Federal Reserve had the authority to take an equity stake in AIG; (2) whether they believed that the Federal Reserve's actions were within the Federal Reserve Bank's "incidental powers" under the Federal Reserve Act and whether the interest rules were fixed with a view to accommodating business and commerce; (3) whether Chairman Bernanke or the Federal Reserve intended the terms of the bailout to be "punitive." We do not agree that Starr has established extraordinary cir-

cumstances justifying the inquiry into the Chairman's mental processes or the Federal Reserve's deliberative processes.

On this record, Starr's efforts to inquire into these issues have all the appearance, and vices, of a fishing expedition rather than an effort to establish legally material facts.

In short, Starr has not established the extraordinary circumstances necessary to justify the deposition of Chairman Bernanke at all while he holds the position of Federal Reserve Board Chairman, much less to inquire into the Federal Reserve's deliberative processes or the Chairman's mental processes. We note that the process-inquiry rationale of *Morgan* and its successors hardly becomes inapplicable upon an official's departure from his office; though we need not say how, that rationale, among other considerations, would play out if Starr seeks to depose Chairman Bernanke even after he leaves his position. Those are matters best addressed in the first instance by the Claims Court and, if necessary, thereafter on further petition to this court. The writ is granted.

Accordingly,

IT IS ORDERED THAT:

The government's petition is granted to the extent that the Claims Court's July 29, 2013 order is vacated and the Claims Court is directed not to allow Starr to depose Chairman Bernanke until such time that Starr has meet its burden consistent with the foregoing analysis and no sooner than February 1, 2014.

11                                                                IN RE US

FOR THE COURT

/s/  Daniel E. O'Toole
     Daniel E. O'Toole
     Clerk

s19